(C. D. 703)

BALFOUR, GUTHRIE & CO., LTD. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 4, 1942)

*Lawrence & Tuttle* (*Charles F. Lawrence* and *George R. Tuttle* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Charles J. Miville* and *Richard H. Welsh*, special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge:  Two importations of whisky from Scotland made at the port of Seattle on November 5, 1939, and April 19, 1940, were assessed with duty by the collector of customs at that port at the rate of $2.50 per proof gallon under paragraph 802 of the Tariff Act of 1930 as modified by the trade agreement between the United States and the United Kingdom of January 1, 1939 (54 Stat. Pt. 2, p. 1897). In addition there was assessed an internal revenue tax under authority of the Liquor Taxing Act of 1934 (48 Stat. 313).  Against these assessments the importer makes no claim of error.  The collector, however, in addition to the above undisputed assessments, levied a countervailing duty of 3d. per imperial proof gallon under section 303 of the Tariff Act of 1930, because of the fact that the Secretary of the Treasury had found that a bounty or grant was paid on British spirits. (See T. D. 34466 and T. D. 35055.)  It is against this last-named assessment that the importer filed protest, alleging (1) that no bounty, grant, or allowance had been made within the meaning of said section 303, and (2) that such assessment contravenes the provisions of the trade agreements between the United States and Canada (49 Stat. Pt. 2, p. 3960) and the United States and the United Kingdom, *supra*.  Reliance is placed on the last-named claim, viz, that British whisky imported into the United States should not be required to pay a countervailing duty if it appears that whisky from other countries is not subjected to such duty.

No testimony was produced, but it was stipulated at the hearing that "no countervailing duty has been assessed, at least at the port of Seattle, on whiskey imported from Canada, or any other foreign country except England, since the Act of 1930."  However, there is no evidence that Canada paid a bounty or grant on whisky.  Had such been the case it would have been the duty of the Secretary of the Treasury under section 303, *supra*, after he had ascertained that fact, to have imposed a duty in addition to the regular duty imposed by the Tariff Act of 1930.  It is plain from the wording of said section that it requires the assessment of countervailing duty upon all dutiable merchandise from every country if any bounty or grant has been paid or bestowed upon the manufacture or production or export of such merchandise.

There seems to be no dispute on the question as to whether a bounty or grant was bestowed on whisky by Great Britain at the

time of the importation here involved. We therefore assume that the plaintiff concedes that point.

Section 303 here involved reads as follows:

SEC. 303. COUNTERVAILING DUTIES.

Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

The applicable provisions of the trade agreement between the United States and the United Kingdom, *supra*, are in the following language:

ARTICLE II

1. Articles the growth, produce or manufacture of the territories of either High Contracting Party shall not be subjected, upon importation into the territories of the other, from whatever place arriving, to other or higher duties or charges of any kind or to any rules or formalities other or more burdensome than those to which the like articles the growth, produce or manufacture of any other foreign country are subject.

2. Articles exported from the territories of either High Contracting Party to the territories of the other shall not be subjected to other or higher duties or charges of any kind or to any rules or formalities other or more burdensome than those to which the like articles exported to any other foreign country are subject.

3. Any advantage, favor, privilege or immunity which has been or may hereafter be granted in the territories of either High Contracting Party in respect of any article originating in or destined for any other foreign country in regard to customs duties and other charges of any kind imposed on or in connection with importation or exportation, to the method of levying such duties or charges, to all matters concerning the rules, formalities and charges imposed in connection with importation or exportation, and to all laws or regulations affecting the sale or use of imported goods within those territories, shall be accorded immediately and unconditionally in respect of the like article originating in or destined for the territories of the other High Contracting Party.

ARTICLE III

Articles the growth, produce or manufacture of the territories of either High Contracting Party shall, after importation into the territories of the other, be

exempt from all internal taxes, fees, charges or exactions other or higher than those payable on or in connection with like articles of domestic or any other origin, except as otherwise required by laws in force on the day of the signature of this Agreement and subject, in the case of the United States of America, to the constitutional limitations on the authority of the Federal Government.

\*      \*      \*      \*      \*      \*      \*

### ARTICLE VI

All the provisions of this Agreement providing for most-favored-nation treatment shall be interpreted as meaning that such treatment shall be accorded immediately and unconditionally, without request or compensation.

\*      \*      \*      \*      \*      \*      \*

### ARTICLE XII

Articles the growth, produce or manufacture of any of the territories to which this Agreement applies on the part of His Majesty the King, enumerated and described in Schedule IV annexed to this Agreement, shall, on their importation into the United States of America, from whatever place arriving, be exempt from ordinary customs duties other or higher than those set forth and provided for in the said Schedule IV, subject to the conditions therein set out. The said articles shall also be exempt from all other duties, taxes, fees, charges or exactions of any kind, imposed on or in connection with importation, in excess of those imposed on the day of the signature of this Agreement or required to be imposed thereafter under laws of the United States of America in force on the day of the signature of this Agreement.

\*      \*      \*      \*      \*      \*      \*

### SCHEDULE IV

\*      \*      \*      \*      \*      \*      \*

In the case of any article enumerated in this Schedule, *which is subject on the day of the signature of this Agreement to any additional or separate ordinary customs duty*, whether or not imposed under the statutory provision noted in the column at the left of the respective description of the article, *such separate or additional duty shall continue in force*, subject to any reduction indicated in this Schedule or hereafter provided for, until terminated in accordance with law, but shall not be increased. [Italics ours.]

Plaintiff's counsel in the brief filed asserts that the ground for objection to the assessment of the countervailing duty rests upon article II and article VI of the British Trade Agreement, above set forth. It is contended that in view of the sweeping character of the language there used British whisky should not be subjected to the assessment of a countervailing duty if it appears that whisky from other countries is not subjected to such duty. It is further contended that the court may take judicial notice that the Secretary of the Treasury has promulgated regulations authorizing countervailing duty only in respect to British whisky and that whisky from other sources is not subject to such countervailing duty. From that premise it is argued that the issue herein presented is controlled by the decision in the case of *John T. Bill Co., Inc., etc.* v. *United States*, 27 C. C. P. A. (Customs) 26, C. A. D. 57, wherein it was held that the imposition

of countervailing duty on German bicycle parts violated the provisions of an existing unconditional most-favored-nation clause in the treaty with Germany, in that similar merchandise from other countries was entitled to entry without assessment or payment of such duty.

It will be noted that the case cited involved the assessment of additional duty under the provisions of paragraph 371 of the Tariff Act of 1930. We set out the language of the paragraph in question.

PAR. 371. Bicycles, and parts thereof, not including tires, 30 per centum ad valorem: *Provided*, That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, in excess of the duty herein provided, there shall be imposed upon such article, when imported either directly or indirectly from such country, dependency, province, or other subdivision of government, a duty equal to that imposed by such country, dependency, province, or other subdivision of government on such article imported from the United States, but in no case shall such duty exceed 50 per centum ad valorem.

Similar provisos were contained in paragraphs 401, 1650, 1687, and 1803 of the same act. It is true that the court referred to the additional duty there assessed as a countervailing duty. However, the duties levied in the paragraphs enumerated are not true countervailing duties, but are in the nature of contingent duties. This distinction was recognized and explained at the time hearings were being held before the Committee of Ways and Means on the Reciprocal Trade Agreement Act, which became section 350 of the Tariff Act of 1930. We quote from the remarks of the Hon. Francis B. Sayre, Assistant Secretary of State, as follows:

* * *. We must be clear in our minds as to the difference between what I shall call "countervailing duties" on the one hand and "contingent duties" on the other. They are two altogether separate and distinct things.

A countervailing duty, to use the word strictly, is a duty which is placed on the product of another country in order to compensate for some bounty, some governmental or other subvention, or the like, which is paid to producers or exporters of that commodity. Under section 303 of the present Tariff Act of 1930, it is provided that whenever any country or private business organization shall pay or bestow a bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, then upon the importation of any such article or merchandise into the United States there shall be levied and paid, in addition to the duties otherwise imposed by the act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. * * *.

Now may I explain what these contingent duties are. These several items relate to certain provisions in the tariff law, each respecting a certain specific commodity, wherein it is specifically provided that, if the rate of duty charged in the foreign country on the importation of such American commodities shall be higher than that charged in this country on the importation of the same kind of commodities from a foreign country, the higher rate shall be levied on the importation from such foreign country of such commodities into the United States.

Now you see that that means; but perhaps I ought to give you a concrete example to bring it out. Automobiles were, in our United States tariff act,

charged a 25-percent duty. Now it happened that in Great Britain, a 33⅓ percent duty was charged against automobiles. Under the Tariff Act of 1939, therefore, it was provided that whenever a British automobile should be imported into America, although we charged only a 25-percent duty against the automobiles of other countries, we must charge 33⅓ percent against British automobiles. In other words, whenever a country happened to have a tariff, even though applied generally and without preference or discrimination, higher with respect to any given commodity than our own, we must charge that higher rate against the commodity coming from that foreign country.

Now what does that mean? With Great Britain, for instance, we have a most-favored-nation treaty whereby the United States undertook to grant to British commodities, as Britain undertook to grant to American commodities, treatment no less favorable than that accorded to the most favored nation. Here was a direct violation of the treaty, therefore, made compulsory by this contingent-duty provision. And, as a result, the State Department began receiving protests from one country after the other because of treaty violation; and the bad part of the situation was and is that the State Department could not deny it. It is a violation of our treaties and we have had formal protests. I have in mind a number of protests from some important countries demanding that we accord most-favored-nation treatment to them. Unfortunately, those provisions in the tariff law, with a single exception, are mandatory. That is, the President is compelled to fix this higher rate of duty. It is not permissive; he is compelled to violate the treaties.

Now, you see, there you are confronted with an altogether different situation from that of countervailing duties. With countervailing duties, it is easy enough, if a country is giving bounties, to raise your tariff rate so as to offset those bounties. But here, in your contingent duty, you have a situation where, although American commodities may be receiving equal treatment in the foreign country, as, for instance, American automobiles were receiving the same tariff treatment as automobiles from any other country so far as England was concerned, yet America is compelled, under these provisions, to discriminate against the commodities coming from such foreign countries as happened to have, with respect to any commodity, a higher tariff than we have. [Hearings before the Committee on Ways and Means, House of Representatives, 73d Congress, 2d Session on H. R. 8430, pp. 374/5.]

It is noted that the Reciprocal Trade Agreement Act as enacted repealed the contingent duty provisos in paragraphs 371, 401, 1650, 1687, and 1803, apparently because of a realization of the fact that the assessment of such contingent duties was in violation of most-favored-nation clauses in treaties. Section 303, however, the true countervailing duty provision in the act, was not repealed.

The Committee on Ways and Means in its report on the bill, being report No. 1000 (To accompany H. R. 8687) used the following language, in connection with the repeal of these provisos:

Under the present bill certain provisions of the Tariff Act of 1930 are repealed. These provide for what are known as contingent duties. Contingent duties are those which depend upon and vary in amount in accordance with the amount of duty placed upon the particular article in the tariff laws of other countries. Under the principle of equality of treatment, the duty which a country charges on a given product must be the same to all countries. This is required by the most-favored-nation clause. What the needs of a particular country are with

reference to the height of duties usually bears little relationship to the needs of some other country with respect to duties upon the same types of articles. Contingent duties, accordingly, are not recognized as fulfilling a legitimate purpose, and are clearly in violation of the most-favored-nation clause.

No other country, with perhaps a single exception, maintain such duties. The United States cannot maintain them without violating its treaty pledges. The present bill is based upon the conception of equality of treatment and absolute integrity of international obligations. The contingent duties are clearly inconsistent with it and must be repealed as a part of an act which is designed to carry out the purpose of the present one.

Contingent duties are to be sharply distinguished from countervailing duties. Countervailing duties are imposed for the purpose of neutralizing the effect of subsidies or bounties granted upon the production or export of the goods which may be imported into the United States. Nothing in the present bill interferes with the full operation of section 303 of the Tariff Act of 1930, under which countervailing duties are and will continue, where necessary, to be levied.

Similarly, there is no interference with the Antidumping Act of 1921, under which protection is afforded against the dumping of goods into the American market. Both antidumping duties and countervailing duties are generally recognized as legitimate exceptions to the obligations of the most-favored-nation clause [Pages 16–17].

It will thus be seen that the distinction between contingent duties and countervailing duties is well recognized. It therefore follows that the decision in the *John T. Bill* case, *supra*, relied on by the plaintiff, is not controlling of the issue here presented.

That the assessment of countervailing duties was not considered by either party to the trade agreement to contravene the provisions of the most-favored-nation clause in such agreement, is indicated in the exchange of notes between the Secretary of State and the British Ambassador at the time of the signing of the agreement, which read as follows:

The Secretary of State [Hull] to the British Ambassador [Lindsay].

DEPARTMENT OF STATE,

*Washington, November 17, 1938.*

EXCELLENCY:

I have the honor to make the following statement of my understanding of the agreement reached, with reference to certain special duties, between the United States and the United Kingdom Delegations in connection with the Trade Agreement signed this day.

These conversations have disclosed a mutual understanding that no antidumping duty, or new or additional duty to countervail the payment or bestowal of a bounty or grant, will be imposed on articles the growth, produce or manufacture of any of the territories to which the Trade Agreement applies, without the Government of the United Kingdom or the Government of the United States of America, as the case may be, first having given the other Government, through an informal notice, an opportunity to make representations with respect to the proposed duty. No decision to impose any such duty will be made within thirty days after the date of the informal notice, unless an earlier decision is required by

law. Any representations submitted by either Government in response to such a notice will be carefully considered by the other Government.

Accept, Excellency, the renewed assurances of my highest consideration.

CORDELL HULL.

His Excellency
The Honorable Sir RONALD LINDSAY,
    P. C., G. C. M. G., K. C. B., C. V. O.,
      *British Ambassador.*

The British Ambassador [Lindsay] to the Secretary of State [Hull].

BRITISH EMBASSY,

*Washington, D. C., November 17th, 1938.*

YOUR EXCELLENCY,

I have the honour to acknowledge the receipt of your Note of to-day's date containing a statement of Your Excellency's understanding of the agreement reached, with reference to certain special duties, between the United States and United Kingdom Delegations in connection with the Trade Agreement signed this day.

These conversations have disclosed a mutual understanding that no anti-dumping duty, or new or additional duty to countervail the payment or bestowal of a bounty or grant, will be imposed on articles the growth, produce or manufacture of any of the territories to which the Trade Agreement applies, without the Government of the United States of America or the Government of the United Kingdom, as the case may be, first having given the other Government, through an informal notice, an opportunity to make representations with respect to the proposed duty. No decision to impose any such duty will be made within thirty days after the date of the informal notice, unless an earlier decision is required by law. Any representations submitted by either Government in response to such a notice will be carefully considered by the other Government.

I have the honour to confirm Your Excellency's understanding of the agreement thus reached.

I have the honour to be, with the highest consideration, Sir,
    Your Excellency's most obedient, humble servant,

R. C. LINDSAY.

The Honourable CORDELL HULL,
    *Secretary of State of the United States,*
      *Washington, D. C.*

It is a safe presumption that both parties to the agreement and their representatives were cognizant of the fact that the United States had been levying a countervailing duty of 3d. per gallon on British spirits of the kind here involved since 1914 (T .D. 34466), and that such a duty was being assessed at the time of the exchange of notes. Had such assessment been considered illegal, certainly it would have been unnecessary and highly improper for the parties to the agreement to express a mutual understanding in regard to new or additional countervailing duties.

It is the opinion of the court, and we so hold, that the plaintiff herein has failed to sustain the burden of proving that the assessment of countervailing duty of 3d. per imperial proof gallon under authority

of section 303, *supra*, was contrary to the terms of the most-favored-nation clause of the trade agreement between the United States and the United Kingdom. It is also the opinion of the court that such assessment does not contravene the provisions of the trade agreement between the United States and Canada.

Judgment will therefore be rendered for the defendant.